## DYER ET AL. VS. BEAN ET AL.

Under the rule that it requires two witnesses, or one witness and strong corroborating circumstances, to overturn a positive denial in the answer; the testimony of a witness, that he was intimately acquainted with a party, and believed that she was a native of the Chickasaw tribe of Indians, without stating upon what facts the belief rests, or that it is common reputation, is not sufficient to establish the fact against the positive denial of the answer.

*Quere:* Has the wife any equitable interest in the money arising from the sale of her real estate, after the proceeds of the sale have come into the hands of her husband?

Where an agent bids off negroes at an administration sale, for and at the request of his principal, who pays for them, and to whom they are delivered, the title of the principal is perfect, without any written conveyance; and no bill of sale subsequently made by the agent to another, can convey any title.

Imperfect voluntary gifts will not be enforced in chancery, no matter how manifest the intention of the party to perfect the gift.

By the common law, the husband and wife cannot contract with each other; nor can the husband make a grant or gift to his wife, nor the wife have personal estate to her sole and separate use. But, in this State, such property may be conveyed directly by the husband, or a third person, directly to the wife; and, in such case, the husband will take the legal interest, and be treated in equity as a trustee for the wife.

Delivery is essential to the validity of a bill of sale; that is, it must go out of the hands or control of the grantor with the intent that it should go to those of the grantee, and must ultimately go there. Proof that, at some time before or after the death of the wife, it was in the hands of the husband, and was destroyed by him, is not sufficient evidence of a delivery to the wife.

Inconsistencies and evasions in an answer, as well as direct contradictions by the evidence, are entitled to consideration in estimating the weight of evidence necessary to overturn such answer.

*Appeal from Franklin Circuit Court in Chancery.*

Hon. FELIX I. BATSON, Circuit Judge.

520      CASES IN THE SUPREME COURT

Dyer et al. vs. Bean et al.      [JANUARY

WALKER & GREEN, for the appellants. The negroes in controversy were purchased with a part of the proceeds of the sale of their mother's "reservation under the provisions of the treaty made by and between the United States and the Chickasaw Nation of Indians; and conveyed, by deed of conveyance, by the agent who purchased them for the defendant, Joab Bean, and by his express direction. But, supposing the proof insufficient to establish the allegation that the negroes were paid for out of the proceeds of Mrs. Bean's land, the validity of the conveyance to her and her daughters, was not thereby affected.

A voluntary settlement binds the party making it, nor can he alter it, how much soever he may be inclined to do so, unless there be a power of revocation. "He must lie down under his own folly. It is void only against creditors, and only to the extent in which it may be necessary to deal with the estate for their satisfaction. To every other person, it is good: satisfy the creditor, and the settlement stands." 1 *Maddox Ch.*, *m. p.* 280.

A voluntary conveyance to a wife by her husband, can only be impeached by a judgment creditor. *Lanton vs. Levy*, 2 *Edw. Rep.* 297; *Magniac vs. Thompson*, 7 *Peters S. C. Rep.* 348; *Taylor vs. Heriot*, 4 *Dessau.* 227; *Jenkins vs. Clement*, *Harp. Eq. Rep.* 72; *Bunn et al. vs. Winthrop et al.*, 1 *John. Ch. R.* 329; *Sourverbye vs. Arden, ib.* 240; *Smith et al. vs. Yell et al.*, 4 *Ark.* 393.

Gifts between husband and wife, *without the intervention* of *trustees*, have often been supported in equity, when not made to the prejudice of creditors, or *subsequent bona fide* purchasers, *without notice. Guardian of Elms vs. Hughes*, 3 *Dessau.* 185.

A husband may, when creditors will not thereby be defrauded, pay for an estate, and direct the conveyance to be made to his wife, and it will be presumed to be an advancement to her. *Spring vs. Hight*, 9 *Maine Rep.* 408; *Sexton vs. Wheaton and Wife*, 8 *Wheat S. C. Rep.* 225; 5 *Cond.* 419; 2 *Story's Com. on Eq. Ju., sec.* 1318. And it was objected, and successfully, too, in the court below :

1st. That Mitchell's executor did not convey the negroes to Hutchins by bill of sale.

2d. That the testimony was insufficient to prove that the bill of sale from Hutchins conveyed the negroes to Mrs. Bean *and her daughters*, and that it was executed by Joab Bean's direction.

If the title to the slaves had been in question between complainants and Mark's representatives, and it had been alleged and proved that, by the law of Mississippi, a bill of sale was necessary to pass the title to slaves, there might have been something in the first objection. By the common law, personal property passes by delivery, and there being no evidence or allegation in the pleading as to the law of Mississippi on that point, the presumption obtains that the common law is in force there.

The sufficiency of the proof to sustain the allegation, that the bill of sale from Hutchins conveyed the negroes to Mrs. Bean and her daughters, and that its execution was by the direction and procurement of Joab Bean, cannot, we think, be seriously questioned; and but slight evidence of the contents of the bill of sale would be required as against Joab Bean, as it is apparent that he destroyed it. "If a man, by his own tortious act, withhold the evidence by which the nature of his case would be made manifest, every presumption to his disadvantage arises against him. And if a person is proved to have defaced or destroyed any written instrument, a presumption arises, that if the truth had appeared, it would have been against his interest, and, accordingly," slight evidence of the contents of the instrument, will in such a case be sufficient. *Broom's Legal Maxims*, 218; *Haldane vs. Havey*, 4 *Burr.* 2484; 1 *Phil. Ev.* 9th Ed. 4478.

The voluntary destruction of written evidence, or its non-production when under the control of a party, after notice to produce, is not sufficient to establish the writing as claimed by his adversary; but every doubt as to its contents, every thing equivocal in the secondary evidence to which his adversary is driven, or imperfect, vague, or uncertain, as in dates, sums and whatever

is material, shall be presumed against him. *Life & Fire Ins. Co. vs. The Mech. Fire Ins. Co.*, 7 *Wend.* 31; 2 *Cow. & Hill's Notes to Phil. Ev.* 293; *Mad. Ch.* 326; *Blade vs. Norland*, 12 *Ward Rep.* 173.

PIKE & CUMMINS, for the appellees. Clearly this property came from the husband. The bid was his, though made through an agent, and he had paid the purchaser money. The bill of sale was in law *his* act and deed.

The rights of Mrs. Bean, and of her daughters, depend upon the general rules of law as administered in this court.

It is not to be doubted that, although agreements between husband and wife, during coverture, for the transfer from him of property directly to her, are void at law, and though equity examines them with great caution before it will confirm them, still it will do so, *when the transfer is fairly made, upon a meritorious or valuable consideration;* and that the cases have gone further, and maintained mere gifts.

In *Wallingsford vs. Allen*, 10 *Peters* 583, where these doctrines were laid down, the transfer was held to have been made for a *valuable* consideration, because in lieu of alimony allowed the wife, pending a suit therefor. *Magniac vs. Thompson*, 7 *Peters* 248, was the case of an *ante-nuptial* settlement, where the marriage that followed was a valuable consideration.

But still, no doubt the rule is, as laid down in *Elms vs. Hughes*, 3 *Dessau.* 153, that gifts from husband to wife are often supported, provided the same be not made to the prejudice of creditors, *or*

And, where a husband has given property to his wife, a mere *subsequent bona fide purchasers, without notice.*
*voluntary* assignee of the husband cannot impeach the transaction as fraudulent. An assignee for the benefit of creditors, is such a *voluntary* assignee. *Rogers vs. Fales*, 5 *Barr* 147.

Thus, in *Adams vs. Brackett*, 5 *Metc.* 280, shares of stock subscribed for by a husband, and certificate taken for them in the name of his wife, were held her separate property. The court

held that there was, what was required in *McLean vs. Longlands*, 5 *Ves.* 79, "a clear and distinct act, by which the husband divested himself of his property."

But this doctrine has not obtained every where. It was repudiated in *Fourth Eccl. Society vs. Mather*, 15 *Conn.* 599, as it was in *Dibble vs. Hutton*, 1 *Day* 221, as an innovation "upon the sacred unity of the persons of husband and wife."

The doctrine is thus stated in *Herr's Appeal*, 5 *Watts & Sergeant* 494, "where a gift by a husband to his wife is reasonable, and not in fraud of creditors, equity sustains it as a provision for her, to which the interposition of a trustee is not indispensable: but such gift must be established by clear and convincing proof, not only of the act of donation and delivery, but of her separate custody of it."

Now, it is exceedingly doubtful, in this case, whether the bill of sale was ever delivered to Mrs. Bean at all. The bill avers that it was, and that it came to the possession of the daughters. The answer of Joab Bean positively denies this, and the evidence certainly fails to overturn the answer.

Even if the court thinks it proven that the land sold to Mitchell was really the property of the wife, still, upon its sale, the proceeds belonged to the husband, subject only to her equitable right to a support therefrom. *Martin vs. Martin*, 1 *Comst.* 473.

FOWLER, also for appellees. Aside from other questions involved, the case stands as a gift at common law, of a *personal chattel*, to a *feme covert* by a *third person*, the title to which vested *eo instanti* in the husband, and, on the death of the wife, *remained his*, of course. And the effect was the same, whether it was a *gift*, *bequest* or *purchase*, and whether the husband paid the purchase money or not. The property became his *absolutely*. 2 *Saund. Pl. Ev.* 567; *Co. Litt.* 351, *b.; Clancy's Husb. and wife*, 1, 2, 3, 4; 3 *Term Rep.* 631, *Milner vs. Milner;* 3 *How. Miss. Rep.* 395, *Lowry vs. Houston;* 10 *Yerg. Rep.* 222, *Ham-*

*rico* vs. *Laird ;* 1 *Edw. Ch. Rep.* 389, *Hunter* vs. *Hallett ; Toller's Law of Executors* 225 *;* 2 *Vern. Rep.* 659, *Harvey* vs. *Harvey.* Taking it in the view, aside from the statutes of Mississippi, &c., of a direct gift from the *husband to the wife,* as it clearly was, it was *void in law;* because, a husband cannot make a gift, or any other transfer of property, directly to his wife. There must be a *trustee.* In this case, there was none. See 1 *Black. Com.* 442 *; Clancy on Husb. and Wife,* 1 *; Freem. Ch. Rep.* 313, *Armfield* vs. *Armfield.* And, the foregoing, placing it in its most *favorable* light for the complainants, is a just view of the character of the transfer to Mrs. *Bean,* by her husband, through *Hutchins,* a *mere agent,* or "conduit pipe," with *no interest* whatever in the transaction. The negroes were purchased *by the husband,* and *paid for by him,* and *Hutchins* the mere *"medium"* to give *color* to a gift to the wife, otherwise *clearly void,* and which is not bettered by such a means. It is manifest that the husband paid for the slaves out of his own means; and the bill of sale must be considered as made to Mrs. Bean by the husband, *directly,* and *without any consideration whatever.*

It is charged, and established by the evidence, that Hutchins made the bill of sale to Mrs. Bean, on account of Bean's being *involved in certain* securityships; and, of course, to *hinder* and *delay,* if not to *defraud, Bean's creditors.* And, all such transfers, independent of the statutes of frauds, whether made directly or *indirectly,* were void at common law, and *fraudulent* as to *creditors, &c.* See 5 *Cond. Rep.* 426, *Sexton* vs. *Wheaton;* 2 *Hayw. Rep* 348, *Brady* vs. *Ellison;* 9 *Dana Rep.* 111, *Thomas* vs. *McCormack; 2 Brockenb. Rep.* 147, *Hopkirk* vs. *Randolph ;* 9 *Ark. Rep.* 486, *Dardenne* vs. *Hardwick.* And, the doctrine that such a contract is binding between the parties, where possession is also transferred, I do not controvert. *But Joab Bean never* transferred the possession in this case; but *retained* it *himself,* with the *exclusive control of the slaves as his own.* And I deny that, in such case, either Mrs. *Bean,* or *her representatives,* could ever enforce the contract against him. Such is not the policy of the

law: and equity never lends its aid.  See 1 *Ves. Sr.* 319, 320,. *Henkle vs. Royal Ins. Co.*

Whatever the parties have *illegally*, or fraudulently, agreed *to execute*, both law and equity *refuse* to compel the one or the other to execute it.  1 *Sug. on Vend.* 444, note 3 ; 4 *Alab. Rep.* (*N. S.*) 525, *Dearman vs. Dearman;* 8 *Ark. Rep.* 82, *Martin vs. Royster et al.;* 5 *N. Car.* (*Ired. Eq.*) *Rep.* 23 ; 11 *Humph. Rep.* 10, 11, *Ohio Ins. Co. vs. Merchants, &c.;* 4 *Pet. Rep.* 188, 189, *Bartle vs. Coleman ;* 1 *Cowp. Rep.* 343, *Holman vs. Johnson.* But, leave the parties where they are found, without lending aid to either.  8 *Ark. Rep.* 82, *Martin vs. Royster ;* 4 *Alab. Rep.* 525; 5 *Alab. Rep.* 193 ; 5 *N. Car. Rep.* (*Ired. Eq.*) 23; 11 *Humph. Rep.* 11, *Ohio Life Ins. Co. vs. Merchants, &c.;* 4 *Pet. Rep.* 188, 189, *Bartle vs. Coleman.*

Mr. Justice WALKER delivered the opinion of the Court.

This is a suit in chancery, brought by the complainants, to recover certain negro slaves, which complainants claimed in right of complainants, Catharine, Elizabeth, and Josephine, as the children and heirs-at-law of their mother, Peggy Bean ; and also under a bill of sale, executed by one Hutchins, at the instance of the said Joab Bean.

The history of the case, as drawn from the bill, is:  That the mother of complainants, Catharine, Elizabeth, and Josephine, was a native Indian woman, of the Chickasaw Nation of Indians, and intermarried with their father, the defendant, Joab Bean, and resided with him in the Indian Nation; that, under the provisions of a treaty made between the United States and said Nation, their mother was entitled to a grant of lands, which she conveyed to their father, the said Joab Bean, who sold the same to one Wyatt C. Mitchell, for the sum of $5000; that Mitchell died, leaving a balance of said sum still due of about $1,450; that, at the sale of Mitchell's property, the negro woman Hannah, and two children, were bought by one Hutchins, for the said Joab Bean, who paid for the negroes with this balance due from

Mitchell's estate for the land; that Hutchins, afterwards, at the instance of Joab Bean, conveyed the slaves to their mother and the complainants (her daughters) by name; that their mother then resided in the State of Mississippi, and that by virtue of the statute laws of that State, their mother, although a married woman at the time, could take and hold slaves in her own right; that she continued to reside there until her death, and that, by virtue of another statute of said State, at the death of their mother, the property descended to, and vested absolutely in, them; that, up to the time of their mother's death, which was in April, 1848, she had possession of the bill of sale from Hutchins to her and her children for the slaves; that the slaves remained in the possession and use of the family, and were claimed and owned by them as their separate and absolute property, and were so recognized and spoken of in the country in which they resided; that, after the death of his wife, Joab Bean removed to Arkansas, with his three daughters (the complainants,) and the negro woman Hannah and her children, and has ever since kept said slaves in his possession, except the girl Caroline, sold to defendant, Mark Bean, all of whom are the children of the woman Hannah; that one of complainants, the daughter of said Peggy, after her death, kept the bill of sale for said slaves in her possession, until some time after the removal of said Joab Bean to Arkansas, when it was by him surreptitiously obtained possession of and destroyed; from which time, the said Joab set up title in himself to said slaves, and sold one of them to his co-defendant Mark Bean, who, at the time well knew of complainant's right to the slaves, and at whose instance the said Joab, by threats and menaces, caused the complainant Elizabeth to sign her own name, and her sister Josephine's, to the bill of sale executed by the said Joab to the said Mark for the girl Caroline, without consideration to them paid.

The other complainants claim, by virtue of marriage with their co-plaintiffs, the children of Peggy Bean.

The defendant, Joab Bean, in his answer, admits his marriage with the mother of complainants, Catharine, Elizabeth, and Jose-

phine; but positively denies that she was a Chickasaw Indian woman, or that she was descended from an Indian woman, or that she was ever in the Chickasaw Nation, until after his marriage with her, which took place in the (then Territory,) now State of Arkansas; admits that, after his marriage, he removed to the Chickasaw Nation, in the State of Mississippi. He positively denies that his wife ever was the head of a family in said Nation, or was entitled to a grant of land there, or that, in fact, any lands were granted to her, or that she ever conveyed any lands to him. He states that he was, in his own right, entitled to a tract of land which was granted to himself, by the Nation, and upon which a patent issued from the United States, in his own name. He admits the sale of this tract to Wyatt C. Mitchell, and that part of the purchase money remained unpaid at the time of Mitchell's death; admits the purchase of the woman Hannah and her children, by Hutchins for him and as his agent, and that they were paid for by crediting his claim against said estate with the sum bid. He denies that any bill of sale was executed, by the executor of Mitchell to Hutchins, for said slaves. He denies that Hutchins made the bill of sale to his wife and daughters, at his instance, but says that, if made, it was done at Hutchins' own instance, without authority from defendant for so doing; that he is advised that Hutchins made the bill of sale, because defendant was involved in securityships, from which Hutchins feared that he might suffer pecuniarily; that Hutchins had no title whatever to the slaves; that the bill of sale executed by Hutchins to his (defendant's) wife and children, never was delivered to them: but was always kept by defendant in his possession, until about a year before the date of his answer, when it was destroyed by himself. He denies that he ever heard of complainant's claim to the slaves, until after his removal to Arkansas; that the negroes have, ever since they were purchased, remained in his exclusive possession and use, and are now held and claimed by him as his absolute property, except the girl Caroline, sold by him to his co-defendant Mark Bean; that the girl, at the time

of the sale, was represented by him to his co-defendant as his absolute property; but that he having heard something of the claim set up by his children, the complainants, expressed a wish that they also should sign the bill of sale, which complainants, Elizabeth and Josephine, did freely and voluntarily, without threats, coercion or undue influence.

Defendant, Mark Bean, claims the title to the girl Caroline, as a purchaser for a valuable consideration; admits that he requested the complainants to join in the bill of sale, to avoid all contest or dispute about the title, having heard that they had asserted some claim to the slaves; that he was not present when the bill of sale was executed and acknowledged, but is informed and believes that it was done freely and voluntarily, without undue influence.

Upon the final hearing of the case, the court below decreed that the bill be dismissed at the costs of complainants, from which they have appealed to this court.

The evidence will be considered in connection with the several questions of fact to be settled.

The complainants set up title to the slaves by virtue of a direct conveyance from Hutchins to Mrs. Bean, and her children by name, and also by descent as her sole heirs. If, however, the title passed to the mother, so as to vest title in her, it is a matter of no importance to the complainants, whether they acquired any title under the bill of sale or not. Because, if the title vested in the mother, and there remained until her death, there is no doubt that her children, under the statute of Mississippi, where she resided at the time of her death, were entitled by descent to the slaves.

This being the case, we will first proceed to investigate the title of the mother.

For the purpose of strengthening the equitable claim of the wife to the slaves, and also as furnishing a motive for making the transfer, or rather for directing Hutchins to make it, the complainants allege that the money paid by Joab Bean to Mitchell,

for the slaves, was part of the purchase money for a tract of land which came to the husband by the wife, Mrs. Bean. We will, therefore, proceed to examine the evidence, and settle this question of fact.

Joab Bean positively denies that his wife was a Chickasaw Indian, or descended from one, or that she was a native of the Nation, or was ever in it until his marriage. He also denies that she was, under the treaty, entitled to a grant of land, or ever received one or conveyed one to him; but admits that he did sell a tract of land, which had been granted to himself, to Mitchell, and out of which he paid for the woman Hannah and the two children. The answer is, therefore, a positive and circumstantial denial of this allegation; and, under a familiar rule, in such cases, it must be taken as true, unless disproven by the positive evidence of two witnesses, or, of one witness, sustained by strong corroborative evidence.

The evidence is clearly not sufficient to sustain the allegation against the denial of the answer. There is only one witness, by whom an attempt is made to prove that Mrs. Bean was a Chickasaw Indian woman, or a descendant of one, or that she was a native of the Nation, or resided there prior to her marriage. These are facts, which, if true, we must presume could have easily been proven. The only witness, who testified, touching this point, was Tuttle. He says, "that he was intimately acquainted with Mrs. Bean, and that he believed she was a native of the Chickasaw tribe of Indians." No facts are given upon which this belief rests, nor is it given as common reputation. As mere belief, it was, in any event, inadmissible, if objected to; but, whether it was objected to or not, is of no moment, for standing, as it does, unsupported any other evidence, it is wholly insufficient to sustain the allegation against the denial of the answer. Mrs. Bean, therefore, according to the evidence, is not shown to be a Chickasaw woman, or a native of that Nation, and, if not, then, under no provision of the treaty, was she entitled to a grant of land.

67BB

But had this not been the case, there is no evidence, either that she received a grant of lands, or that she conveyed any land whatever to her husband, except that of Tuttle and Howry. Tuttle says "that he *believes* that, under the laws of the country, the said Peggy Grace was entitled to three sections of land, not ¾ sections. He does *not* know that Joab Bean procured a title to said land from his wife. A patent issued from the United States, and was issued in the name of said Joab Bean's wife, the said Peggy Grace." This belief of the witness, in regard to matters which, if they ever transpired, were from their nature of necessity reduced to writing, and matters of record, would if objected to, have been excluded, but, as the exception to the admissibility of evidence, only went to hearsay evidence, as secondary evidence, unexcepted to at the time when it was offered, we must give it such weight as it is entitled to. But, so far from being supported by the testimony of the other witness, Howry, his statement, in an important particular, is flatly contradicted. Howry says that the patent for the land sold by Joab Bean to Wyatt Mitchell, issued in the name of Joab Bean alone; and, when we remember that this witness was the executor of the estate of Mitchell, and no doubt had the custody of his title papers, his statement, so far from sustaining the allegation in the bill, or the statement of Tuttle, fully sustains the answer of Bean in this particular. It is also shown, by this witness, that the deed from Bean and wife to Mitchell, was certified in accordance with the treaty stipulations, which, as argued by counsel, raises a strong presumption that the land conveyed was *acquired* under a grant under the provisions of the treaty, and that, as no provisions by treaty was made for allowing white men, resident in the Nation, separate claims for land, Bean could not thus have acquired a grant; and, if not acquired by him, it must necessarily have come through the wife. This persuasive argument is certainly entitled to consideration. What the real state of case is, is a matter of much doubt from the evidence—it certainly falls short of sustaining either the bill or the answer. Under the issue, it de-

volved upon the complainants to show that the grant was made to Mrs. Bean. This, we think, has not been sufficiently done. It is not shown that Mrs. Bean was a Chickasaw Indian, or the head of a family, or, in any respect, one of the class of persons provided for by the treaty; nor that any grant whatever was made to her: nor is there any proof that she ever made a transfer of any grant to her husband. The treaty prescribes the manner in which, if a Chickasaw woman married to a white man, she shall make a conveyance. Until she shows this to have been done, even conceding the proof to exist of a grant to her, she would fail to sustain her bill by proof. But, so far from this, the weight of the evidence tends to prove that the patent issued directly to Joab Bean, in his individual right, and, to that extent, goes to sustain the answer, which, under all the circumstances, must prevail.

Having thus disposed of the question, as to the equitable interest of the wife of Joab Bean, in the fund out of which he paid for the slaves, if indeed she could be said to have any in the proceeds of the sale of property after the money had come to the hands of the husband, the next question to be considered, relates to the purchase and subsequent transfer, or attempt to transfer them, by Hutchins to Mrs. Bean, or to her and her children.

There can be no doubt but that Hutchins bid for the negroes, at the request of Joab Bean, and for him; and, on the same day, delivered them to Bean; and that Bean paid for the negroes out of the proceeds of the sale of the tract of land to Mitchell.

Whether Hutchins did or not receive a bill of sale for the slaves, from the executor of Mitchell's estate, as alleged by the complainant, is a matter of doubt, according to the evidence. Harvey, the executor, says, "That he does not remember whether he made a bill of sale to Hutchins or not, but is inclined to think he did." Hutchins, who bid off the slaves, says, "He does not remember to have received a bill of sale for the slaves, but thinks he did not."

Giving the statements of these witnesses equal credit, and pre-

suming that if such instrument had been executed, either would, under the circumstances of the case, be equally apt to have remembered it, we may consider the belief of one a fair set-off against that of the other.

Joab Bean states positively, in his answer, that no bill of sale ever was executed to Hutchins, and the answer remains unimpeached. And, as a necessary and legitimate consequence, therefore, it follows, that the legal title passed to, and vested in,. Joab Bean. The bid by Hutchins having been at Bean's instance, and for him, was, in fact, his bid; the slaves were at once delivered over to Bean as his property, and his title became and was perfect without any written conveyance; Hutchins so understood it, and testifies "That the original title to the slaves was in Joab Bean:" in other words, that Bean was, in fact, the purchaser at the sale of Mitchell's estate. Bean, in his answer, states that the bill of sale was made by Hutchins to Mrs. Bean, after the payment of the purchase money for the slaves by him.. There was, therefore, at the time the bill of sale was made to Mrs. Bean, nothing wanting to make the title in Joab Bean perfect and conclusive, both in law and equity. To test this matter fully, after all this, suppose Hutchins had himself set up a title, legal or equitable, to the slaves, upon what would it have been based? Upon the bid? That was for Bean. Upon the fact that he executed his notes for the purchase money? The money was paid by Bean. Upon a formal transfer to him by bill of sale? None such was made. Upon possession of the slaves? He had delivered them to Bean. There is, therefore, no shadow of ground upon which to rest a claim or title in him; and, consequently, he could convey no title, because he had none to convey.

The title, both legal and equitable, was in Joab Bean; and, if under his directions, Hutchins had made a conveyance in Bean's name, the conveyance might have been held good as the act of Bean, through his agent Hutchins. But such was not the case; the bill of sale was from Hutchins, in his own right, and not as agent for Bean, or in Bean's name; and, consequently, no title passed

by virtue thereof to Mrs. Bean, or to her and her heirs or children.

But, if it should be said that Bean, by directing the bill of sale to be made, adopted it as his, and is, in equity, bound by it, still there is this obvious difficulty to be surmounted. Being an imperfect gift, however manifest the intention of Bean may have been to settle this property upon his wife and children, the chancellor will not enforce it.

In the case of *Coleman vs. Sanell*, 1 *Ves. Jr., page* 51, it was argued, for the complainant, that the gift was an equitable gift, instead of a legal one. In answer to which, the Lord Chancellor replied, "If you have it at law, there is an end : if not, the question is, whether you can have a voluntary agreement executed in equity. The difficulty is to show a case where any voluntary gift has been executed in equity. You are not upon a question whether a court of equity will set up a deed, you cannot proceed upon at law." And, in the further consideration of the same case, the Chancellor said : "Where a deed is not sufficient in truth to pass the estate out of the hands of the conveyor, but the party must come into equity, the court has never yet executed a voluntary agreement. To do so, would be to make him who does not sufficiently convey, and his executors, after his death, trustees for the person to whom he has so defectively conveyed; and there is no case where a court of equity has ever done that. Whenever you come into equity to raise an interest by way of trust, you must have a valuable, or at least a meritorious, consideration. Nothing less will do." And so, also, it was held in *Antrobus vs. Smith*, 12 *Ves.* 46, and *Willan vs. Willan*, 16 *Ves.* 82, that a court of equity will not lend assistance towards perfecting a mere voluntary contract.

Under these authorities, it is very evident that, no matter how manifest the intention of Joab Bean may have been, to have the property conveyed, and notwithstanding the attempt to convey it through Hutchins, (which we have seen was not sufficient to convey the legal title,) and no matter how strong the equitable

obligations upon him to perfect it, if upon a valuable consideration, yet, being a mere voluntary gift, it cannot be enforced.

But, if we could be mistaken upon this point, as the conveyance would, in legal effect, be from the husband, in whom the legal title vested, the wife could gain no aid from the statute of Mississippi, which permits a *feme covert* to take and hold property in her own right, because the statute, in express terms, excepts out of its provisions conveyances from the husband to the wife after coverture, and the question would arise, could she hold a separate estate by deed of gift or otherwise, made directly to her. By the common law, the husband and wife cannot contract with each other, nor can the husband make a grant or gift to the wife, nor the wife have personal estate, to her sole and separate use. Such contracts are void at law. *Willingsford vs. Allen*, 10 *Peters U. S. S. C. Rep.* 594; *Tomay vs. Sinclare*, 3 *Howard Rep.* 326.

Not only is the wife's capacity to contract with her husband, extinguished by the merger of her legal existence in his, but as her possession is, in contemplation of law, his possession, she is incapable of receiving from him that delivery and transfer of it, which is essential to the validity of gifts.

When property is intended to be conveyed to the separate use of the wife, whether by the husband or by a third person, the most usual, and perhaps the safest course is, to convey it in trust to a third person for the use of the wife. Many of the earlier decisions seem to hold this as indispensably necessary, but, with the exception of Connecticut, most, if not all, of the American courts, in conformity too with the later English decisions, hold that the interposition of trustees is not indispensably necessary. *Willingsford vs. Allen*, 10 *Peters S. C. R.* 594; *Elens vs. Hughes*, 3 *Dessau.* 148; *Spring vs. Hight*, 22 *Maine Rep.* 408; *Herr's Appeal*, 5 *Watts & Serg.* 498; *Hill on Trusts* 611. And such also has been the decision of this court. *Smith et al. vs. Yell*, 4 *Ark. Rep.* 295. But a deed made directly to the wife, will create a separate use without the interposition of trustees. In such case

the husband will take the legal interest, yet he will be treated in equity as a trustee for the separate benefit of the wife. *Hill on Trusts* 609. And whatever question may arise as to the words necessary to create a separate trust for the wife's use, when the conveyance is made by a third person to the wife, yet, when made by the husband to the wife, it must, though not in express terms, necessarily be for her separate use; otherwise, the disposition would be futile. *Steel vs. Steel,* 1 *Iredel Eq.* 452.

. If, therefore, the bill of sale, which we must consider as, in. effect, a voluntary settlement of property upon the wife, had been executed to Joab Bean himself, and such as would have conveyed an absolute title to the slaves, we should, under the authorities to which we have referred, uphold it as a valid gift or settlement upon the wife without the interposition of trustees, and without reference to the statute of Mississippi, which cannot govern the case, when considered as a conveyance from the husband.

But suppose we should consider that the legal title was, at the time Hutchins executed the bill of sale, in him, and the bill of sale in all respects sufficient to convey the title in the slaves to Mrs. Bean, if delivered to her in person, or such acts done as in law amounted to a delivery, the question is, under the issue in this case, in which the due execution of the deed is put in issue, was there in fact a delivery in this case, or such acts as amounted to a delivery. Considered as the act of Hutchins, a third person, under the statute of Mississippi, the wife was, beyond question, competent to take and hold the separate and exclusive legal title in the slaves, and the same rules of law, governing contracts between persons resting under no legal disability, will apply to this state of case.

As a question of fact, to be settled by the evidence, under the rule that when the answer is under oath, and puts in issue a fact alleged by the complainant, by a direct denial thereof, that the positive testimony of two witnesses, or one witness with strong corroborative circumstances, is necessary to overturn the answer, a preliminary question is raised, which may, to some exent, qual-

LAW S.
LIBRARY

ify the rule in particular cases. It is this, that, as the answer of the defendant, Joab Bean, has been met and flatly contradicted, in regard to one or two material facts in issue, in regard to which, from their nature, we must presume he was informed (as for instance, with regard to the execution of the notes for the purchase money for the slaves, and also with regard to the execution of the bill of sale by Hutchins, with his knowledge or consent) whether these circumstances do not so far detract from the credit due to the answer, as to allow slighter proof to overturn it, than if it stood uncontradicted.

The rule in the common law courts, is, to allow such circumstances to go to the discredit of the witness, and there would seem to be no satisfactory reason why it should not apply to the answer of a defendant, and such would seem to be the rule held by the Supreme Court of New York, in the case of *Forsyth vs. Clark*, 3 *Wend.* 646; *Jackson vs. Hart*, 11 *Wend.* 349.

Without intending to establish a rule of evidence, upon the authority of these decisions, we do not hesitate to say, that inconsistencies and evasions, as well as direct contradictions by the evidence, are entitled to consideration in estimating the weight of evidence necessary to overturn an answer.

That portion of the evidence bearing upon the question of delivery, is substantially as follows: Hutchins, who executed the bill of sale, states the fact that he did so, at the request of Joab Bean, and that it was executed to Mrs. Bean and her heirs. Henry Frick states that, after Bean removed to Arkansas, he heard him say that his daughters (complainants) had a bill of sale for the negroes until a debt was paid. He also states that he found an instrument of writing in his trunk, which he took to be a bill of sale for the negroes, and handed it to one of Bean's daughters, (one of complainants). Hulda Johnson states that, after Bean came to Arkansas, she heard him say that his daughters had told it about that the slaves belonged to them: that they had had a bill of sales for the negroes, but that he had got it, and torn it up, and burned it. George Taylor, who deposed

with regard to what transpired in Mississippi, says the bill of sale was given by Hutchins to Mrs. Bean, wife of Joab Bean, and he had it in his possession: the bill of sale read: "I have this day bargained and sold, to Peggy Bean, one negro woman and two children, for the sum of fourteen hundred and fifty-four dollars." This, together with the fact that the negroes always remained in the possession of Bean, and as far as the evidence tends to show, served the family as slaves usually do, and from which, under the circumstances, but little can be drawn, because, even if they had been formally delivered to Mrs. Bean, they would have continued, in all probability, to perform the same service, and be controlled in the same way. Much of the evidence, with regard to common neighborhood understanding, was hearsay, and, under the exceptions taken on both sides, should be excluded.

From the evidence of Hutchins and Taylor, it is most probable that the bill of sale was made to Mrs. Bean alone, or to her and her heirs, not to her daughters by name; and, if so, then the complainants must take as heirs of their mother, and in order to recover, they must show title in her. What, then, do these facts prove? Certainly not a delivery of the bill of sale to Mrs. Bean; because there is no evidence, whatever, that, at any time during her life, she knew any thing of the transaction, or set up any claim to the property, unless we take common rumor, which can not be admitted as evidence. See *Blagg vs. Hunter, July term, Manuscript Opinions.* Nor are we to be understood, that actual delivery of a deed is necessary, although that is the usual manner of delivery. Mr. GREENLEAF, in his work on *Evidence, vol.* 2, *sec.* 297, expresses himself in terms which we prefer to adopt. He says, "The delivery of a deed is complete, when the grantor or obligor has parted with his dominion over it, with intent that it shall pass to the grantee or obligee; provided the latter assents to it, either by himself or agent." Admit, in the case before us, that Hutchins did execute the bill of sale, and passed it from his possession to a third person, with the intent on his part, that it

68BB

should pass to Mrs. Bean, the question is, did Mrs. Bean assent to it; or, if it be said that, as this deed was for her use and benefit, her assent will be presumed, the question still recurs, did it so pass, or did Mrs. Bean, by any act, ratify it? If the deed, at any time during the life of Mrs. Bean, had been in her possession, or if found after her death, amongst her effects, delivery would be presumed. *Sicard vs. Davis*, 6 *Pet.* 124; *Sengham vs. Wood*, 15 *Wend.* 545.

It has been held, in some cases, that even where the deed remains in the possession of the grantor until after his death, and then comes into the hands of the grantee, that the delivery will be sufficient: as where one made a voluntary conveyance by way of provision for his daughter, but kept the deed in his possession, until after his death, the conveyance was held good. *Buma vs. Winthrop*, 1 *J. C. R.* 329. Or, in case where, by the terms of the deed, the grantor is as much interested in its preservation as the grantee, the grantor may retain the possession of the deed without formal delivery. *Blakemore vs. Burnside*, 2 *Eng. Rep.* 508.

But as a deed takes effect from delivery, which is essential to its validity, it must be delivered; that is, must go out of the hands or the control of the grantor with the intent that it should go to those of the grantee, *and that ultimately it does so.* The point, at which the proof fails here, is, that we have no evidence what disposition Hutchins made of the bill of sale. The witness Taylor saw it in Joab Bean's possession, but, whether before or after the death of Mrs. Bean, does not appear. It may be inferred as well before as after. As this was in Mississippi, and the proof is that, very soon after Mrs. Bean's death, Joab Bean removed to Arkansas, this fact of itself raises the presumption that it never was delivered. *Hatch vs. Haskins*, 5 *Shep.* 391.

The other witness found the paper, which he supposed to be a bill of sale to Joab Bean's daughters, for the slaves, in his trunk, and gave it to one of them. How this came there, is not explained.

The witnesses, Frick and Johnson, depose as to admissions of Bean, and if we were considering this, as a title derived from him, they certainly conduce, in no small degree, to establish the existence of a bill of sale to his daughters, and also of its delivery; for he admitted that they had had the bill of sale, and the presumption is, that it was delivered to them, unless we may suppose that they gained possession of it through Frick, who says he found it in his trunk, and gave it to them. How it came there, is not explained. Indeed, it is impossible to read the evidence in this case, without being struck with the omission to explain fully the facts and circumstances, which must, in the nature of things, have existed, and which, with almost studied care, are omitted. Detached parts of conversations, are given, without explanation, or the circumstances which gave rise to them. But, notwithstanding all this, these after-conversations, however they may tend to prove possession of the bill of sale by the complainants, which is *prima facie* evidence of delivery, but remotely tend to prove that the bill of sale was ever in the possession of Mrs. Bean. Bean says, in his answer, that the bill of sale never was in his wife's possession, or in that of his daughters, but was always kept in his own possession. There is no positive evidence contradicting his answer, whilst there is that of Taylor, going to sustain the statement that he kept the bill of sale in his own possession; and, notwithstanding this, in view of all the facts and circumstances of the case, as detailed by the witnesses, although slight and unsatisfactory taken separately, when considered together, they leave a strong impression upon our mind that, if the facts were fully developed, they would show a delivery of the bill of sale to Mrs. Bean.

But clear and unquestionable proof is required to authorize a decree in a case of this kind, as expressly held in *Willinsford vs. Allen*, 10 *Peters S. C. R.* 594; *Clancy on Husband and Wife*, 260. And we would not feel altogether satisfied that the evidence in this case was sufficient to overturn the answer: nor is it necessary that we should decide this point, because, from the

view taken of the case, the contingency upon which this question would arise, does not exist. Hutchins had no title to the slaves at the time he executed the bill of sale, and of course communicated no title by it.

So far as regards the rights of Mark Bean, the other defendant, they evidently stand upon different ground. The bill of sale executed by Joab Bean to him, was also executed by two of the complainants, and although it is charged that the bill of sale was executed by them under duress, the proof of the subscribing witnesses is very clear that such was not the case. But, an inquiry upon this branch of the case is unnecessary, because, under the view which we have taken of the case, the complainants are not entitled to recover as against Joab Bean, and, of course, they can not controvert the title of one holding under him. Let the decree be affirmed.